## Morton Estate (No. 2)

Before Klein, A. J., Saylor, Shoyer, Pawelec & Silverstein, JJ.

LEFEVER, J., November 16, 1972.—This trust arises under the will of Thomas G. Morton, who died May 20, 1903, whereby he bequeathed his residuary estate to his trustees, in trust, to pay two-thirds of the net income to his wife, Ann K. Morton, for life, and one-third to his daughter, Bertha St. C. M. Gittings, for her life. Upon the death of Bertha, the trustees were directed to pay her share of income equally to her children for their respective lives and upon the death of each of them to pay the principal from which the one dying had been receiving income to his or her issue per stirpes. Testator further directed that upon the

death of his wife, her share of income was to be paid equally to his daughters, Helen K. Morton and Isabella M. Jenks, for their lives, and upon their respective deaths their income was to be paid to their respective children for their lives, with remainder over to their issue per stirpes. Testator further directed that in the event of the death of any of his said daughters, Helen, Bertha and Isabella, without leaving lawful issue living at the time of her death, then and in such case the share of the daughter so dying was to be divided equally among the surviving daughters and at their deaths to their children in the same manner and for the uses and purposes under the trusts and limitations, as provided for their original shares.

To assist in clarifying the facts in this case, a family tree is attached. Since testator's death, the following events have occurred:

(a) Testator's widow, Ann K. Morton, died March 30, 1907, whereupon the two-thirds share of income which she had been receiving thereafter became distributable to the daughters, Helen and Isabella, in equal shares, during their respective lives.

(b) Testator's daughter, Helen K. Morton, died June 26, 1927, without issue, whereupon under the express cross-limitations the one-third share of income which she had been receiving fell in to augment the shares of testator's daughters, Bertha and Isabella.

(c) Testator's daughter, Bertha St. C. M. Gittings, died October 8, 1943, survived by five children, Thomas M. Gittings, Samuel E. Gittings, Isabel S. Gittings, Clair G. Brady and James S. Gittings, and by no issue of deceased child or children. All of these children of said daughter were born in testator's lifetime, except James S. Gittings, who was born November 20, 1905.

i. James S. Gittings, (grandson of testator, and one

of the children of the daughter, Bertha) while enjoying his life estate, which had vested at his mother's death, died on August 5, 1968, survived by one son, James St. C. Gittings, to whom the principal supporting his father's life estate (a 6/50th share of the then principal of the trust) presumptively passed under the will. However, by adjudication dated April 10, 1970, Judge Bolger held that since James S. Gittings was born after testator's death, the remainder violated the rule against perpetuities. Hence, he awarded 6/50th of the principal of the trust by intestacy in the original testator's estate. On exceptions to the adjudication, the court en banc affirmed in opinion dated September 23, 1970, by Judge Shoyer (50 D. & C. 2d 8 (1970)). [The parties entitled according to the intestate laws at testator's death were the widow for a 5/15ths share, the three said daughters and two sons of the testator, each for a 2/15ths share, and they were all deceased prior to July 13, 1959, the date of death of Ann W. Jenks Lyne, a grandchild of testator (one of the three children of testator's daughter, Isabella M. Jenks, who had survived said daughter and who at their said parent's death irrespective of a question that the ultimate remainders may be void, succeeded to an equal share of the 30/60ths share of income which their mother had been receiving at her death, or each 10/60ths). The said Ann W. J. Lyne died without issue, and it was held by adjudication of Judge Bolger dated June 26, 1961, to which no exceptions were filed, that testator died intestate as to one-sixth (10/60ths) share of principal which had supported said grandchild's life estate (the latter interest having vested at her mother's death) for the reason testator failed to provide any cross-limitations or cross-remainders in the event of the death of any grandchild without issue, and none could be implied].

ii. Isabel S. Gittings, granddaughter of testator, died on June 9, 1971, unmarried and without issue.

iii. Samuel E. Gittings, grandson of testator, died on July 28, 1971, leaving a son, Samuel E. Gittings, Jr., who is sui juris.

iv. Thomas M. Gittings, grandson of testator, died on April 26, 1972, leaving a son, Thomas M. Gittings, Jr., and a daughter, Elizabeth Ann Gittings, both sui juris.

v. Clair G. Brady, granddaughter of testator, still survives and has no issue.

(d) Testator's daughter, Isabella M. Jenks, died on July 30, 1955, survived by three children, Thomas S. Jenks, Morton Jenks and Ann W. J. Lyne, and by no issue of deceased child or children. All three of said children of Isabella were born subsequent to testator's death.

i. Ann W. J. Lyne died on July 13, 1959, without issue.

ii. Thomas S. Jenks still survives and presently has living three children.

iii. Morton Jenks still survives and has four living children.

(e) Testator's two sons, Thomas S. K. Morton and Arthur V. Morton, both of whom survived him have long since been deceased, Thomas having died September 11, 1930, survived by issue, and Arthur having died March 27, 1949, without issue.

The present account was filed by reason of the deaths of Isabel S. Gittings on June 9, 1971, and Samuel Evans Gittings on July 28, 1971, and since the filing of the account Thomas M. Gittings died on April 26, 1972. Thus, the question submitted for determination at this audit is the disposition of the portions or principal representing the share of the granddaughter, Isabel S. Gittings, who has died without issue, and the respective shares of the grandsons, Samuel Evans Gittings and

Thomas M. Gittings, both born in the lifetime of testator and each of whom has been survived by issue.

Accountant, on the advice of its counsel, takes the position, and has so given notice to the various parties having or claiming any interest, that testator has died intestate with respect to the share of principal (3/22nds) from which Isabel S. Gittings was receiving the income, since the same factual situation exists regarding this grandchild (one of the children of testator's daughter, Bertha) as that of the grandchild, Ann W. J. Lyne (one of the children of testator's daughter, Isabella), each of them having died without issue, and the adjudication of Judge Bolger, dated June 26, 1961, holding and declaring that an intestacy ensued by reason of the failure of testator to provide any express cross-remainders, is controlling. Accountant suggests that, by reason of the long lapse of time since the death of the intestate heirs of testator, and the various and sundry devolutions from and through their respective estates, direct awards be made (as set forth in detail in statement of proposed distribution) subject to such transfer inheritance tax as may be due and assessed in the intervening estates.

On the other hand, the accountant takes the position, in consequence of opinion of its counsel, that the respective shares of principal from which the two grandsons, Samuel E. Gittings and Thomas M. Gittings (both born in the lifetime of testator) had been receiving income, are validly disposed of in favor of their respective issue, each such grandchild having been born in the lifetime of testator and each upon death having been survived by issue. Counsel is of opinion that these distributions are governed by the adjudication of Judge Bolger, dated April 10, 1970, affirmed as aforesaid by the court en banc, in an opinion by Judge Shoyer.

Counsel for Samuel Evans Gittings, Jr. (the surviving

child of testator's said deceased grandson, Samuel E. Gittings), and for Thomas M. Gittings, Jr. and Elizabeth Ann Gittings (the surviving children of testator's said deceased grandson, Thomas M. Gittings), similarly contends that the remainders which testator provided in favor of the child or children of the child or children of his respective daughters are a series of separate limitations and independent gifts in remainder as for the share of each child of a daughter and under the doctrine of separability of remainders, "vertical separability," as first enunciated in Pennsylvania in Harrah Estate, 364 Pa. 451 (1950), which adopted section 389 of A. L. I. Restatement, Property, the remainders in favor of the aforesaid three great-grandchildren of testator whose respective parents were living at the death of testator, must be upheld.

Austin M. Lee, Esq., who was appointed guardian and trustee ad litem to represent only the lines descended through Isabella M. Jenks, daughter of testator, whose children were all born subsequent to testator's death, concurs in the position of counsel for accountant that under the will of testator and under applicable law, the share of Isabel S. Gittings, granddaughter of testator who has died without issue, passes by intestacy in the original testator's estate. On the other hand, he disagrees with the position of counsel for accountant, as well as that of counsel for the three great-grandchildren, Samuel Evans Gittings, Jr., Elizabeth Ann Gittings and Thomas Morton Gittings, Jr., that the remainders in favor of these said three great-grandchildren, whose respective parents were born in the lifetime of testator, must be validated and upheld.

No party in interest controverts the position of accountant that the share of principal from which testator's granddaughter, Isabel S. Gittings (one of the

children of her daughter, Bertha), was receiving income at her death passes by intestacy in the original testator's estate, which similarly was the case and result in respect of the share of principal from which testator's granddaughter, Ann W. J. Lyne (one of the three children of his daughter, Isabella) was receiving income and who died in 1959 without issue. The auditing judge adopts the position of accountant and, therefore, will award a 3/22nds share of present corpus of trust by intestacy in original testator's estate, to the parties so entitled as set forth in the statement of proposed distribution to be made direct by reason of the various devolutions, subject to such transfer inheritance tax as may be due and assessed.

The remaining and prime question for determination is whether the remainders to the issue of the deceased grandsons, Samuel E. Gittings and Thomas M. Gittings, such grandchildren having been born in the lifetime of testator, stand or fall?

Judge Shoyer in his opinion of September 23, 1970, for the court en banc (sur the exceptions to said adjudication of Judge Bolger, dated April 10, 1970), 50 D. & C. 2d 8 (1970), stated at page 19:

"Looking at this family tree 67 years after testator's death, this is the picture that we see coming to focus. Of a total of nine grandchildren, descended through two of testator's three daughters, it seems that five will be survived by issue, and only two of these five lines will comply with the rule against perpetuities. As a result of this factual situation, a further question may be presented in the future arising from the problem posed by Comment f of the Restatement [Property], §389, and discussed in Edwards Estate, 407 Pa. 512. We refrain from expressing any opinion at this time concerning this question."

Quigley's Estate, 329 Pa. 281, 289 (1938), enunciated the doctrines of "Horizontal Separability" and "Organic Plan," as follows:

"Ordinarily the validity of prior limitations is not affected or disturbed by reason of ultimate ones which transgress the rule against perpetuities. . . .

"It is true there are cases in which prior bequests, entirely valid in themselves, *fall by reason of being but incidental factors in a general plan of distribution the vital portion of which is invalidated because of remoteness, or, in other words, where a series of limitations form such an integrated testamentary scheme that they cannot be separated from one another without defeating the organic plan of the testator.*" (Italics supplied.)

In Harrah Estate, 364 Pa. 451 (1959), the will of testator, who died in 1890, set up a trust with income to his son, George, for life, with ⅓ of the income to George's widow for life, and thereafter, subject to the widow's interest, income to George's children for life "and upon the death of any such children, to distribute his or her share . . . according to the intestate laws . . ." All of the children of George were living at testator's death. The court stated the doctrine of "vertical separability" at page 462, et seq.:

"There is no reason why, in determining whether a testamentary provision is void as to a remainder to the heirs of a hypothetical child of the cestui que trust, which child might possibly have been born after the death of the testator whose will created the trust, this court should not apply the doctrine of separability as to the remainders of the heirs of each child of the cestui que trust, which later children were living when the testator died. In upholding those remainders which are legal because not violative of the rule against per-

petuities we are not defeating the 'organic plan of the testator.' "

"We find no reason in logic or in public policy why the whole remainder should be adjudged void because the remainder to the heirs of George's hypothetical child born after testator's death would violate the rule against perpetuities [page 457] . . . since, in fact, there were no children born to George after the death of the testator, it would be an extreme and socially unwise application of the Rule against Perpetuities to hold that all gifts in remainder were void as violative of that rule [page 459] . . . We decide that the successive remainders provided for in the will of Charles J. Harrah to the heirs of the various children of his son, George W. Harrah, living when the testator died *are separable* from the remainder to the heirs of a possibly 'after-born' child of George W. Harrah": page 463.

The doctrine of "vertical separability" is embodied in section 389 of the Restatement, Property, but comment f to that section suggests that the separability principle may not apply where, as here, there is "such a distortion of the general plan of disposition that, . . . (under section 402) the invalidity of the part would cause the invalidity of the dispositions of corpus in all the shares. . . ."

Section 402 of the Restatement, Property, states:

"When part of an attempted disposition fails as a direct consequence of the rule against perpetuities, the effect, if any, of this partial invalidity upon the balance of the attempted disposition is determined by judicially ascertaining whether the conveyor, if he had known of this partial invalidity, would have preferred that

"(a) all the balance of the attempted disposition take effect, in accordance with its terms; or that

"(b) certain parts of the balance of the attempted disposition fail, but the rest thereof take effect in accordance with its terms; or that

"(c) all the balance of the attempted disposition fail."

As pointed out in comment a to the above section, the "judicially ascertained intent . . . rests chiefly upon judicially crystallized conclusions as to what a conveyor normally would have intended if he had actually considered the possibility of the partial ineffectiveness of his complete plan . . ."

In Edwards Estate, 407 Pa. 512 (1962), the court, through Mr. Chief Justice Bell, stated the question, at page 514:

"The sole issue in this case is the correctness of the determination of the Court below that the invalid limitations were so much a part of testator's testamentary scheme of distribution that the intermediate life estates became infected and must fall."

The court then quoted from Quigley's Estate, 329 Pa. 281, 289, and Lilley's Estate, 272 Pa. 143, 153, at page 515:

" ' "Where the limitations of the prior and ulterior estates are so intimately and inseparably intertwined that the failure of the limitation of the latter disturbs the main and dominant purpose of the testator, of which the prior limitations are a part, such prior and ulterior estates are void; so, too, where the prior estate is but a mere agency to accomplish a transgression of the rule." Perhaps, instead of making the criterion the "dominant intention" of the testator, it might be better, adopting phraseology from the opinion in McCaskey's Estate, 293 Pa. 497, 508, to inquire whether "the striking down of the void gifts would, in vital matters, so emasculate his (the testator's) plan of distribution, as

to render it reasonably certain he would not have made the will in the way he did had he known it could not be sustained in the respects in which it must be set aside." ' "

The court concluded, at pages 517 and 518:

"It is apparent that the aforesaid life estate as well as the ultimate gifts of corpus are so essential to his scheme, that, being invalid, he would not want the prior valid gifts of income to continue. The Court below agreed with the auditor that the testator's primary consideration was of Mary E. Edwards, and that his plan in the Fourth Paragraph was to delay vesting of his estate until vesting in the great-grandchildren of the named beneficiaries or grandchildren who might be born after lives in being and 21 years thereafter.

"We believe the testamentary scheme, the general plan of distribution and dominant intent of this testator was to tie up his trust estate for a period far beyond that permitted by the Rule."

Clearly, the instant case does not fall within the illustration to clause (c) of section 402 of the Restatement of Property. There, the declaration of invalidity resulted in an outright distribution by intestacy working equality among the natural objects of testator's bounty. In the case at bar, there is a distortion of distribution in either event, because the will of Thomas G. Morton established trusts for the benefit of three daughters and their issue to the exclusion of testator's two sons; hence, an intestacy in the original estate would divert a portion of the assets from the female lines. Further diffusion would result from the applicable distributive schemes in the estates of testator's children and grandchildren, all of the former and many of the latter now being deceased. Moreover, validation of the two remainders after life estates to grandchildren

in the female lines would give to three great-grandchildren the shares originally intended, while all the rest would descend through the original estate.

Testator in the instant case obviously intended to benefit his daughters and the lines descended through them on a stirpital basis. However, the rule against perpetuities and the lack of provision for gifts over in default of issue as to remainder interests defeated his intention. This poses the question what testator "normally would have intended if he had actually considered the possibility of the partial ineffectiveness of his complete plan." (Comment a, section 402, Restatement, Property.)

It appears that this will was drawn by a trust officer and not by a lawyer. Clearly, he wished his great-grandchildren to receive the remainder. But he ran afoul of the rule against perpetuities, a very technical rule. This rule destroyed his plan.

Looking at the family tree in 1903, it is apparent that while testator knew his five children and most, if not all, of his grandchildren, the latter were of tender age or unborn at the time of his death. The oldest grandchild was 10 years of age and the others were considerably younger. None of the great-grandchildren were born in testator's lifetime, and, in fact, came into the world no less than 12 years and as much as 58 years after his death. While he had, in 1903, five children and numerous grandchildren and he may have contemplated the generations succeeding them, it is doubtful whether in hindsight he would have singled out the issue of two of his grandchildren (of nine descended through female lines), to receive remainder shares of his estate to the partial exclusion of the issue of three others. Therefore, his organic plan was defeated or emasculated.

Accordingly, equity and justice dictate the striking

down of the two remainders in question. This will achieve the preferable result in a very difficult case.

The respective shares of principal from which testator's two grandsons, Samuel Evans Gittings and Thomas Morton Gittings, were receiving income, each a 3/22nds share of the present corpus, will, therefore, be awarded by intestacy in the original testator's estate, distribution to be made direct, where possible, by reason of various devolutions in such cases where the intervening estates have been duly settled, subject however, to such transfer inheritance tax as may be due and assessed. See Garman's Estate, 211 Pa. 264 (1905); Mickelson's Estate, 13 D. & C. 686, 687 (1930); James Estate, October term, 1909, no. 603, opinion of Henderson, J., for court en banc, January 22, 1931; Lafferty's Estate, 17 D. & C. 40, 49 (1932); Plogstert Estate, 350 Pa. 474 (1944).

The balance of principal as shown by the account, as supplemented by supplemental account submitted at audit, to wit, $152,207.47, composed as set forth in said supplemental account, less compensation to Austin M. Lee, Esq., guardian ad litem and trustee ad litem, in sum of $750 is awarded: 13/22nds thereof to the First Pennsylvania Banking and Trust Company, trustee, in further trust for the uses and purposes of the continuing trust for Clair Gittings Brady, Morton Jenks and Thomas S. Jenks; and the remaining 9/22nds to the intestate heirs of testator, Thomas G. Morton, according to the suggested awards set forth in statement of proposed distribution reflecting the various devolutions, subject to such transfer inheritance taxes as may be payable in intervening estates.

The balance of income as shown by the account, as supplemented, $10,430.52, with any additional collections of income to time of actual distribution of outgoing shares, subject to distribution already made

aggregating $6,610, is awarded: (a) in respect of the three still surviving grandchildren of testator, 3/22nds thereof to Clair G. Brady; 5/22nds thereof to Thomas S. Jenks; and 5/22nds thereof to Morton Jenks; and (b) in respect of the three deceased grandchildren of testator, Isabel S. Gittings, who died June 9, 1971, Samuel Evans Gittings (who died July 28, 1971, and Thomas Morton Gittings, who died April 26, 1972), 3/22nds, with due regard to distribution already made, as accrued to June 9, 1971, to the personal representatives of estate of Isabel S. Gittings, and that accruing thereafter to the parties taking outgoing share under the declared intestacy; 3/22nds as accrued to July 28, 1971, with due regard to distribution already made, to the personal representatives of estate of Samuel Evans Gittings and that accruing thereafter to the parties taking outgoing share under declared intestacy; and 3/22nds as accrued to April 26, 1972, with due regard to distribution already made, to the personal representatives of estate of Thomas Morton Gittings and that accruing thereafter to the parties taking outgoing share under declared intestacy.

Payment and distribution is so decreed.

A schedule of distribution in accordance with Rule 72 will be submitted to the auditing judge, which, when approved and annexed hereto, will form a part hereof.

And now, to wit, November 16, 1972, the account is confirmed nisi.

## SUR EXCEPTIONS TO ADJUDICATION

SHOYER, J., February 23, 1973.—The distribution picture which we visualized in 1970[1] at the

---

[1] Morton Estate, 50 D. & C. 2d 8, 20 Fiduc. Rep. 578 (1970).

audit of the trustee's third account has now come more sharply into focus. Three of the six grandchildren then left holding life estates have since died, one without issue, two with issue. Samuel E. Gittings, grandson of testator, died on July 28, 1971, leaving a son, Samuel E. Gittings, Jr., who is sui juris. Thomas M. Gittings, grandson of testator, died on April 26, 1972, leaving a son, Thomas M. Gittings, Jr., and a daughter, Elizabeth Ann Gittings, both sui juris.

Since both Samuel E. Gittings and Thomas M. Gittings were living when testator died in 1903, their surviving children, being the great-grandchildren of testator, would be entitled to receive their shares of corpus under the rule of vertical separability adopted by our Supreme Court in Harrah Estate, 364 Pa. 451 (1950).

Three grandchildren of testator still survive. One, Clair Gittings Brady, born in 1900, has no issue. Although the common law deems her still capable of issue (List v. Rodney, 83 Pa. 483 (1877)), the learned auditing judge assumed on the basis of modern medical statistics[2] that she was physically past the childbearing age. With this assumption we agree, for there is precedent for ignoring the common-law rule in order to make a will effective: Wright's Estate, 284 Pa. 334, 341 (1925).

The life interests of Thomas S. Jenks, who has three living children, and Morton Jenks, who has four living children, continue. But since both Thomas and Morton were born after testator's death, their issue are in violation of the rule against perpetuities, and on the death of Thomas and Morton will not inherit if we should then follow our ruling in the third accounting

---

[2] See Kelby Estate, 80 D. & C. 1, 2 Fiduc. Rep. 268 (Lefever, J., 1952).

when we invalidated the share which had supported the life estate of James S. Gittings.

Summing up, Judge Lefever, the auditing judge, found that out of a total of nine grandchildren (descended through two of testator's three daughters) five have been, or probably will be, survived by issue but only two of these five subclasses will comply with the rule against perpetuities so that their issue may inherit testator's remainders.

The rule of Harrah Estate, which followed in essence the holding of the English Court of Chancery in the case of Cattlin v. Brown, 11 Hare 372, 68 Eng. Rep. 1319 (1853), would validate the 3/22nd stirpital remainder shares to the issue of Samuel E. Gittings and the issue of Thomas M. Gittings, but no others. The remainders to the issue of Thomas and Morton Jenks, should they survive their parents, as seems likely, are doomed to fail just as the remainder to the son of James S. Gittings failed on the third accounting. This result, the learned auditing judge held, would defeat or emasculate testator's "organic plan," so "equity and justice dictate the striking down of the two remainders in question." We agree.

Counsel for the exceptants, Samuel E. Gittings, Jr., Elizabeth Gittings and Thomas M. Gittings, Jr., complains that testator had not one but three "organic plans" for his family. Looking at the whole will from its four corners, as we must, we perceive absolute equality in the disposition of his residue among the great-grandchildren descended through his daughters, following equal life interests to the daughters themselves and equal stirpital life interests to their children. The 2/3rds life interest to the widow of testator was specifically burdened with the "support and maintenance of [his] daughters, Helen and Isabella." Those two daughters were to share this 2/3rds

after their mother's death, and cross remainders of the income from the entire residue were provided for testator's "surviving daughters" should any one of the *three* die without living issue. We regard the absence of the usual cross remainders for distribution of the corpus, where testator's grandchildren might die without issue, as an oversight. Actually, this omission, whether intended or not, tends to bring the male lines into the picture and works no inequality with female lines. Essentially, this was testator's "organic plan" and we see it as a plan for equality.

As to the alleged separate plan for the two sons, we do not know the amount of the life insurance given them, but there is nothing disruptive of equality in a 1903 testamentary plan which distinguishes the male from the female line. The normal testator expected his sons to support their wives from their earnings just as he sought to prevent his sons-in-law from living off his daughters' inheritance. So Thomas G. Morton directed, in items Fifth and Sixth of his will, that the income from his residuary trust should be for his daughters' "sole and separate use notwithstanding any coverture and not to be in any way or manner liable to the debts, contracts or engagements of" a daughter's present or future husband.

The allegedly separate plan for Isabella and Helen permitted them no more than one-third each of the residuary income, the same amount as the share going to Bertha. Their life interest in the income from the Mutual Life insurance was offset or equaled by the continuation of the $1,500 allowance to Bertha, who was already the mother of four children at the date of the will.

The final testamentary disposition by testator was in the Eighth item concerning his summer home "Clonmel" wherein he expressly sought to avoid dis-

crimination "in favor of any one or other of my family," and directed the sale or rental of this property.

In summary, testator showed no extreme or unusual preference among the members of his family in disposing of his initial estate. In distribution of his residuary estate, he intended *absolute equality* on a stirpital basis among the third generation of his descendants through the female lines. This was his organic plan. The rule against perpetuities would distort this plan so violently as to exclude from participation eight of 11 probable remaindermen. The learned auditing judge reasoned that "it is doubtful whether in hindsight [testator] would have singled out the issue of two of his grandchildren (of nine descended through female lines), to receive remainder shares of his estate to the partial exclusion of the issue of three others." He rightly concluded that "the preferable result in a very difficult case" would strike down these two valid remainders by applying the doctrine of infectious invalidity.[3]

At the time of the third accounting which followed the death of Bertha's after-born son, James S. Gittings, six life estates continued in the four surviving children of Bertha and the two sons of Isabella Jenks. We there

---

[3] In two memorable articles, Professor W. Barton Leach has condemned the mechanical and irrational application of the Rule Against Perpetuities, which so frequently faults the testator with strident rhetoric but penalizes the testamentary heir with economic sanctions. Both articles appeared in volume 51 of the Harvard Law Review in 1938: "Perpetuities in a Nutshell," page 638; "The Rule Against Perpetuities and Gifts to Classes," page 1329. In a footnote on page 1332, the learned author comments: "Indeed if the court wants to be punitive, whom is it going to punish? To exhume the testator and flay his corpse would be considerably more rational than to impoverish his grandchildren. The Scripture did not mean violations of the Rule against Perpetuities when it referred to the sins of the fathers."

applied the rule of separability which the Supreme Court approved in Harrah and held that our voiding of the remainder to James's son, James St. Clair Gittings, as too remote, would not infect the continuing life estates. We were not then called to rule on the validity of any other remainders. We did intimate what the future probably had in store, but, having decided that the invalidity of one remainder did not so vitally affect testator's scheme of ultimate distribution that the intermediate life estates became infected and must fall, we rightly postponed our judicial consideration of any additional remainders. In like vein, we now postpone any ruling on the remainders of the three life estates of Clair Gittings Brady, Thomas S. Jenks and Morton Jenks.

In Harrah, our Supreme Court quoted the rule of section 389, Restatement, Property, in full. They also quoted the appended illustration because it so closely paralleled the facts in Harrah. They did omit the reference to comment f as to the effect of partial invalidity. We now quote comment f:

"f. Partial invalidity. A situation is imaginable in which the rule stated in this Section would result in the sustaining of life interests in favor of all the members of the class described in Clause (a), but in the destruction of all but one of the several ultimate dispositions of corpus. Such a situation could involve such a distortion of the general plan of disposition that, under the rules stated in Chapter 28 (§§402-403), the invalidity of the part would cause the invalidity of the dispositions of corpus in all the shares or the invalidity of the entire disposition. No such cases have been encountered in the reports. Normally when a conveyor has become sufficiently interested in the 'children of X' to make in their favor such a disposition as is described in Clause (a), X will have had all or most of

the children he ever has. Hence no case has been found in which a sufficient distortion has been caused by the rule stated in this Section to bring into application those rules as to partial invalidity, under which otherwise valid parts of the attempted disposition are invalidated."

Like the authors of the Restatement, our own exhaustive research has turned up no reported case on all fours with the stated problem of infectious invalidity.

We have noted with interest New England Trust Co. v. Sanger, 337 Mass. 342, 149 N.E. 2d 598 (1958), which involved remainders after life estates given to three children of Dr. Sanger, the first life tenant, one of which children was born after the creation of the inter vivos trust in 1913. The three children and their issue were to succeed to their father's life estate until the death of the last surviving child, when corpus would be distributed to their issue per stirpes. In an effort to avoid violation of the rule against perpetuities, the settlor created a second trust in 1930 disposing in like manner of any reversion of the original trust estate that might result from a future declaration of invalidity. All three children enjoyed income for a time after their father's death. The after-born child survived the older children, one of whom died with issue, the other without issue. The lower court followed the rule of Leake v. Robinson, 2 Meriv. 363, 35 Eng. Rep. 979 (1817), and construed all remainders to be void under the 1913 trust. (Leake v. Robinson stated the rule which was followed generally until the separability construction in Cattlin v. Brown, supra, gained judicial favor.) The after-born child claimed his continuing one-third share of income from the 1913 trust and one-half the income under the 1930 trust. To avoid this disparity with the issue of the deceased child, the lower court forthwith

invalidated the 1913 trust. The Supreme Judicial Court approved, stating, at pages 352 and 354:

"This inequality can be eliminated and full effect can be given to the settlor's original plan if all the interests in the 1913 indenture following the gift of income to Dr. Sanger are declared invalid under the principle sometimes called 'infectious invalidity.' This would eliminate the transition period during which the two trusts would concurrently operate under overlapping plans, and place the fund forthwith into the 1930 trust, where the entire fund would be administered in accordance with the real intent of the settlor. This is what the decree did, and we think it was right.

". . . We think that in these circumstances it would be inappropriate and unfair to apply the rule against perpetuities mechanically to the specific gifts which violate the rule, and then disregard the consequences of the application. We think that when it is clear that the settlor wanted the good and bad gifts to be made together, and an alternative scheme of disposition is available under which they can be made together in substantially the same form as the settlor intended, the good and the bad parts should not be regarded as severable, but should fall together. Restatement: Property, §402, illustration 3, comment g. Am. Law of Property, §24.52. Simes and Smith, Law of Future Interests (2d ed.) §1262. Estate of Whitney, 176 Cal. 12, 19."

Just as the Massachusetts court found it necessary in carrying out testator's intent to regard the children's life estates as not severable, we hold here that it would be inequitable to sever the good remainders from the bad. We approve the action of the learned auditing judge in voiding the good remainders along with the bad.

The balance of the estate principal was awarded back

to the accountant to distribute the income to Clair Gittings Brady, Thomas A. Jenks, and Morton Jenks during their respective lives. No exceptions have been filed to this award by the learned auditing judge. We approve the same because these "life estates have a vitality of their own in testator's testamentary plan" and there is no evidence that testator would have intended otherwise: Davis Estate, 449 Pa. 505, 510, 511 (1972).

The exceptions are dismissed and the adjudication is confirmed, absolutely.